SCHMELLER v. UNITED STATES
(three cases).

Nos. 9659–9661.

Circuit Court of Appeals, Sixth Circuit.

June 6, 1944.

Joseph B. Keenan, of Washington, D. C. and Gerard Pilliod, of Cleveland, Ohio, for appellant John L. Schmeller.

Parker Fulton, of Cleveland, Ohio, for appellants Frank I. Schmeller and Edward Schmeller.

Don C. Miller, of Cleveland, Ohio, for United States.

Before SIMONS, ALLEN, and MARTIN, Circuit Judges.

ALLEN, Circuit Judge.

The appellants, together with numerous other officials and employees of the National Bronze and Aluminum Foundry Company (hereinafter called the Foundry Company) and the Foundry Company itself, were indicted for conspiracy to defraud the United States, in violation of § 88, Title 18, U.S.C., 18 U.S.C.A. § 88; for conspiracy to violate § 103, Title 50, U.S.C., 50 U.S.C.A. § 103, and for violating § 103, Title 50, U.S.C., 50 U.S.C.A. § 103, by making war material, that is aluminum castings, in a defective manner. The appellants were convicted solely on count III of the indictment, which contained nine counts. All other defendants were acquitted on all counts.

Appellants contend (1) that count III does not state a criminal offense, and (2) that there is no substantial evidence of guilt. In addition appellant John L. Schmeller contends that since count II was identical with count III except that it charged a conspiracy, acquittal on count II constitutes a bar to conviction on count III, and also contends that the court erred in its charge to the jury.

Late in 1940 or early in 1941 the Foundry Company, which had for many years been in the general foundry business and had made aluminum castings for airplanes used in World War I, agreed with the Packard Motor Car Company (hereinafter called Packard) to produce aluminum castings to be used in Rolls-Royce Merlin XX aircraft motors under contracts theretofore executed between Packard and the Governments of the United States and Great Britain. Under the contracts Packard was required to submit to the United States Army Air Corps and the British Government vandykes, specifications and test motors. Upon acceptance by the Army Air Corps the vandykes and specifications could not thereafter be changed without its consent. Packard drew up certain specifications, later accepted by the Army Air Corps, which included the terms and conditions under which the castings were to be produced, the specifications being embodied in purchase orders accepted by the Foundry Company. The castings were to be manufactured from an aluminum alloy designated as PM754, and the amended specifications which were in force during the period of this controversy contained the following clause: "Precautions: (a) Castings shall not be repaired by plugging, welding, or other methods without written permission from the purchaser."

Appellants Frank I. Schmeller, plant manager, and Edward Schmeller, assistant plant manager and metallurgist, were in direct charge of the operation of producing the castings. Owing to a violent quarrel between Drake, purchaser for Packard's aircraft division, and Frank Schmeller, Drake insisted at the outset that Helm, general superintendent of the Foundry Company and one of the codefendants below, be in complete charge of the Packard castings. Helm, however, had no authority either to select the method in which the castings should be made or to alter that method when selected. The men in the metal department were responsible to Frank Schmeller and Edward Schmeller, who were superior to Helm. Appellant John L. Schmeller, executive vice president, is not shown to have exercised any control over the foundry operation.

During the period in question some 50,000 aluminum parts, including superchargers, manifolds, cam covers, and oil pans or crank cases, were delivered to Packard by the Foundry Company, some three per cent or less of which were rejected because of foundry imperfections. In April, 1942, Drake was informed that certain castings delivered by the Foundry Company were welded, and protested against this about April 13, 1942, in a telephone conversation with Helm. April 16, 1942, a formal letter was sent to the Foundry Company, attention Mr. Helm, with copy to John L. Schmeller, notifying the appellants to cease the practice. Packard continued to receive welded castings, and Drake telephoned both Helm and John L. Schmeller several times, saying the welding would have to cease. Schmeller assured Drake that castings were not being welded. In June Drake wrote Helm that Packard could not use welded castings, and on June 17th he visited the Cleveland plant and stated to Helm that the practice of welding castings had to be stopped. Helm again stated that the Foundry Company was not welding castings. On June 24th Drake, together with Baker and Rodgers, Packard's chief inspector and assistant chief inspector respectively, visited the plant of the Foundry Company and repeated the warning against welding. Baker explained the danger which might be caused by the attempt to repair aluminum airplane castings by welding. He testified at the trial that welded castings, owing to fatigue from excessive vibration of the motor and the unusual stress and strain of its operation, might blow out and cause the plane to fall or the motor to catch fire and explode. John L. Schmeller assured Drake that castings were not being welded. In August, 1942, representatives of the Army Air Corps visited the Foundry plant and repeated the warning, but welded castings from the Foundry continued to be received by Packard.

Helm, after receiving the letter of protest sent April 16, 1942, by Drake, conferred with Edward and Frank Schmeller, who had received copies of the letter. It was decided to continue welding although it was to be limited to very small operations. As explained by Helm, they were to do "slight touch-up welding" in order to get out production. He said that they could not get out the castings without some welding. Later, early in June, 1942, it was decided to give Packard the definite impression that no welding was being done on Packard parts, and thereafter the welding was concealed in various ways. While formerly the operation had been conducted throughout the day, in July Frank Schmeller ordered a shift in hours so that the welding was done late at night or early in the morning. About this time Frank Schmeller upbraided a workman for welding in the usual hours, saying that he did not want that done "during the daytime." The office clerk was told at various times to notify some one in the welding department that "so-and-so was in the plant and to stop welding." Edward Schmeller, on occasions, notified him to contact the foremen and tell them that "certain officials are in the plant." On one occasion the doors were barricaded with barrels in order that the Packard officials might be kept out. It was ordered that whenever Packard inspectors were expected the welding room was to be cleared of castings or closed.

While the specifications provided that a test bar should be cast with each melt of castings, test bars were sent with the castings which had not been cast with the particular melt.

Each casting bore a heat number stamped on by the Foundry Company, which indicated the month, the day, and the pour in which the casting was made, and a serial number placed on it by Packard after delivery. When the rejected castings were received from Packard by the Foundry Company, in certain cases the heat number was peened off and a new number was stamped on. Orders were given that the repaired casting was to be cleaned and sandblasted so that the welding would not show, and in that condition it was returned to Packard. The concealment of the welding made it difficult for Packard to detect defects which sometimes might have been remedied prior to the final tests of the motor.

Count III of the indictment in its material portions charged that "John L. Schmeller, Frank I. Schmeller, Edward Schmeller, James C. Helm, Otto M. St. John, alias Al St. John, Robert W. Chrysler, Benjamin Prudenza and The National Bronze and Aluminum Foundry Company * * * the United States being then and there at war and the United Kingdom, hereinafter termed Great Britain, being then and there an associate nation of the United States in said war, with reason to believe that their act might injure, interfere with and ob-

struct the United States and its associate nation Great Britain in preparing for and carrying on said war, did knowingly, wilfully, unlawfully and feloniously make and cause to be made, in a defective manner, certain war material to wit: The said defendants caused a certain casting bearing part No. 600603, heat No. 4215 and serial No. E 260, to be welded at the National Bronze and Aluminum Foundry Company, which said casting was then and there being manufactured by the National Bronze and Aluminum Foundry Company for Packard Motor Car Company, to be furnished by Packard Motor Car Company to the United States and its associate nation Great Britain, the said casting being intended for, adapted to and suitable for the use of the United States and its associate nation Great Britain in connection with the conduct of said war, in violation of Section 103, Title 50, United States Code, 50 U.S.C.A. § 103; contrary to the form of the statute in such case made and provided and against the peace and dignity of the United States."

Appellants' contention that count III does not state an offense is based upon the proposition that the gist of the statutory crime is wilfully making or attempting to make war material in a defective manner. Count III alleges that an identified casting was made "in a defective manner" and that the appellants caused it "to be welded." Appellants therefore urge that the count does not set forth that the casting was made by welding in a faulty manner. It is contended that the indictment in effect charges that welding of an airplane casting is in and of itself a defective making and that the count is fatally incomplete because it does not state either that the welding was defectively done or was so done as to render the casting defective or dangerous. The question was raised by demurrer which was overruled.

The indictment is based upon § 103, Title 50, U.S.C., 50 U.S.C.A. § 103, which reads: "When the United States is at war, whoever, with intent to injure, interfere with, or obstruct the United States or any associate nation in preparing for or carrying on the war, or whoever, with reason to believe that his act may injure, interfere with, or obstruct the United States or any associate nation in preparing for or carrying on the war, shall willfully make or cause to be made in a defective manner, or attempt to make or cause to be made in a defective manner, any war material, as herein defined, or any tool, implement, machine, utensil, or receptacle used or employed in making, producing, manufacturing, or repairing any such war material, as herein defined, shall, upon conviction thereof, be fined not more than $10,000 or imprisoned not more than thirty years, or both."

Under the latter part of this statute the specific intent to injure or interfere with the war effort of the United States or any associate nation need not be proved. The act of wilfully making war material in a defective manner, with reason to believe that the act may injure or interfere with governmental war measures, constitutes the offense. The appellants were indicted under this portion of the statute.

The Government in its brief states that the violation charged by count III was not that the casting was welded in a defective manner, but that by reason of the fact that the casting was welded it was rendered defective. We agree with the appellants that if count III simply alleged that the casting was welded it would be fatally defective. The statute does not penalize any particular method of making war material, and indeed it would hardly be practicable to do so, as methods change with the advance of the art. Welding is a long-established foundry practice in the making of castings for airplane motors, and the very fact that welding of castings for Packard was forbidden in the specifications "except with permission" shows that welding did not under all circumstances result in defective airplane parts. It appears from Government witnesses that Ford welded many thousand cylinder-heads for the Pratt & Whitney airplane engine, on what the expert considered to be a highly-stressed part. Moreover, while it was contended that Packard itself could not weld without securing permission from the Army Air Corps, it appears from the testimony of Baker, chief inspector for Packard, and of the resident Army Air Force inspector, that Packard instituted welding of airplane parts in February, 1942, without securing permission from the Army Air Corps and without any directive being issued to permit such welding, but merely, as Baker says, upon permission of the Army Air Force inspector. The inspector testified that they "had some crank-cases in with the number 7 manifolds short of stock, and the Salvage Board decided to see if we couldn't weld

those to build up the stock that was short," and stated that that was under "no directive of anybody."

Government experts testified that a weld properly done is not a defect. While one expert limited this statement by adding "except in a highly-stressed area," the same witness then described the Ford welding operation on the cylinder heads of the Pratt & Whitney engine and stated that it was permissible to weld aluminum castings in stressed areas. The Government inspectors described good, as distinguished from poor, welds. One stated that certain poor welds which he illustrated from the castings made by the Foundry Company, exhibits in evidence, would not result in a substantially defective or dangerous appliance because the welds were very small and were not situated in a stressed area. He concluded that they could not in any way interfere with the normal operation of the casting.

■■ We think the making of defective war material which is condemned in general terms by the statute must necessarily be such a making as to interfere with the normal functional result of the particular product. This record clearly shows that certain minor defective welds do not so interfere, and Packard in fact conceded this by its practice. Packard's representatives at the plant of the Foundry Company in March, 1942, were present when welding was done. Packard also repaired some of the Foundry Company's welds in its own factory. Later this was done under so-called "controlled welding," a system instituted by Packard in which the welding is subject to various rigid tests established in order to obviate the existence of substantial defects; but the fact that Packard did so-called "controlled welding" does not militate against appellants' contention. The immediate question is whether, under the statute, any and all welding in and of itself results in defective war material. This record shows conclusively that it does not.

■ But count III does not charge that the appellants violated the statute simply by welding the casting. It charges that with reason to believe that the United States or the associate nations would be injured, appellants wilfully made the particular casting "in a defective manner" by welding. The appellants are clearly apprised of the specific offense charged, for the casting is identified and its heat number gives the appellants the precise date. The charge that the casting was made in a defective manner is adequate, for the allegation to the effect that it was defectively made by welding is merely another method of stating that it was made by welding defectively. The indictment therefore states an offense under the statute.

■ The contention that since there was an acquittal on count II, the conspiracy count, conviction on count III is barred, is clearly untenable. The test as to whether acquittal on one charge bars conviction on another charge is whether the same evidence would be required to establish the commission of both crimes. Copperthwaite v. United States, 6 Cir., 37 F.2d 846; Gilmore v. United States, 10 Cir., 124 F.2d 537, certiorari denied, 316 U.S. 661, 62 S. Ct. 941, 86 L.Ed. 1738. While certain evidence under the two counts is identical, much of the evidence necessary to establish conspiracy is not required nor proper for proof of the substantive charge. Conspiracy involves the element of agreement, of the existence of a single design for the accomplishment of the common purpose. There must be a combination by concerted action to accomplish an unlawful result, or to accomplish a lawful result in an unlawful manner. Such evidence may not be competent to prove the substantive offense. Two distinct offenses were charged in these counts, and hence acquittal on one does not bar conviction on the other. United States v. Rabinowich, 238 U.S. 78, 85, 35 S.Ct. 682, 59 L.Ed. 1211; Tinsley v. United States, 8 Cir., 43 F.2d 890; Kelly v. United States, 6 Cir., 258 F. 392, 395.

■ It is contended on behalf of Edward and Frank Schmeller that the isolated instance of defective making is insufficient to support conviction. The argument is that since the jury found that the appellants did not defectively make or cause to be made the castings described in counts IV, V, VI, VII, VIII, and IX, and found them guilty of defectively making only one casting described in count III, the conviction cannot be sustained because intent to do wrong cannot be shown from a single act. This contention also must be overruled. The statute plainly covers the wilful making in a defective manner of any machine, or part of a machine, used for war purposes. It is true that repetition of the offense is evidence of wilful making; but wilfulness may be established by other evidence. It is conceivable that a single air-

plane designed for a specific mission might be the target of an unlawful attempt at sabotage, and the statute was purposely drawn to cover single, as well as multiple, transactions of this kind.

 A more difficult question is presented by the contention that the court committed prejudicial error in its instructions to the jury on the evidence. The court admitted exhibits 1 to 46 en masse. This constituted a group of documents, some unsigned and some containing hearsay, taken from the files of and kept in the regular course of business by the Foundry Company, and stated to have been made, or "presumably" to have been made at or about the time of the transactions to which they refer. They were admitted as falling within the purview of § 695, Title 28, U.S. C., 28 U.S.C.A. § 695. As to certain of these documents we think that this admission en masse was error. The purpose of the enactment of § 695 was to eliminate the technical requirement of proving the authenticity of business records and memoranda by the testimony of the maker. Landay v. United States, 6 Cir., 108 F.2d 698, 705. The mere fact that the paper offered in evidence is taken from a business file and is otherwise proved in compliance with § 695 does not establish its competency. It is questionable whether all of the papers offered in evidence in this mass of exhibits were made as memoranda or records. It is also questionable whether all of the matters to which they related were relevant. Section 695 in no way repealed the ordinary requirements of relevancy and competency. The District Court should have examined and ruled upon each paper separately, and should have excluded the hearsay and other incompetent evidence.

All of the defendants below objected to all of the 46 exhibits on the ground that certain documents were not connected with the charge against the individual defendants personally. The court overruled this objection, stating "On the failure of the Government to tie in any one of these defendants to the conspiracy, or to establish a conspiracy, at that time they may be ruled out. Until such time they will be received." This statement was repeated by the court in overruling similar objections made by one or another of the numerous defendants as to the admission of testimony not on its face applicable to the particular defendant; and the court then instructed the jury that the exhibits were received "at this time with the very definite understanding that they cannot apply and cannot be used against the various defendants if their connection with this conspiracy is not established, or a conspiracy is not established by the United States Government." However, the court in its general charge did not instruct the jury that in the event the conspiracy was not established this evidence should be disregarded, and gave no instruction whatever on the subject. Since the jury found that no conspiracy existed, and that none of the appellants was connected with the conspiracy charge, appellants contend that the jury could not rightly consider this evidence with reference to, the substantive charge. Appellants were plainly entitled to have such an instruction included in the general charge if they had requested it, but no such request was made.

The instruction to the jury quoted above was given on September 14, 1943, the second day of the trial, and the jury was charged and retired for deliberation on October 5, 1943. The nine counts of the indictment, covering 30 printed pages, charged numerous overt acts. Eight defendants were joined in the count upon which the appellants were convicted. In the conspiracy count eight defendants were charged to have conspired with twenty-one co-conspirators. The jury could not be expected to remember and rightly apply an instruction given on the second day of a long and involved trial unless it was repeated in the general charge at the point where it would be effective.

 The gain in speed and economy of trial which results from the consolidation of criminal cases is often offset by the disadvantage at which the defendants are placed by the consolidation. The trial court has the obligation of safeguarding the rights not only of the Government, but also of the individual accused, and must see to it that such rights are not jeopardized by the consolidation for trial of numerous cases. We think that the failure to include in its general charge the instruction which the court had assured the defendants would be given was plain and prejudicial error in a matter vital to the defendants, and not waived by the failure to request such a charge after the evidence was concluded. Wiborg v. United States, 163 U.S. 632, 659, 16 S.Ct. 1127, 1197, 41 L.Ed. 289; Crawford v. United States, 212 U.S. 183, 194, 29 S.Ct. 260, 53 L.Ed. 465, 15 Ann.Cas. 392; Fisk v. United States, 6 Cir., 279 F. 12, 18;

Bogileno v. United States, 10 Cir., 38 F.2d 584, 587; Strader v. United States, 10 Cir., 72 F.2d 589, 593.

Another danger arising from the consolidation of criminal trials is that defendants may be prevented from presenting their evidence in its entirety. Certain testimony was given that welding was a usual foundry practice, and the court, in a commendable effort to exclude merely cumulative evidence, was over-zealous in preventing the appellants from elaborating on this matter. The court refused to permit Helm, who was charged as a codefendant, to testify as to whether the welding of the castings in and of itself rendered the castings defective, for the reason that he was not an expert on Rolls-Royce motors. But experts had testified who were not experts on Rolls-Royce motors. This was Packard's first experience in making airplane motors. Several employees of Packard who had not had long acquaintance with the Rolls-Royce engine testified on the general subject. LaRock, whose testimony established the defectiveness of the casting made on April 2d, had not specialized in Rolls-Royce motors. His practical experience before going to the laboratory of the Federal Bureau of Investigation was two months employment with the American Smelting and Refining Company. Helm, on the other hand, was better qualified in foundry practice than any other witness. It was material to the defense to establish from their own witnesses the propriety of welding under proper circumstances, and it was error to exclude this testimony.

The District Court refused to allow Frank Schmeller to make a material statement along the same line. His attorney asked, "Did you believe that the welding of the type that you described was proper?" The answer was "Yes, sir." The District Attorney objected and the court sustained the objection and struck the answer out. The question was then presented in this form: "From your experience in the foundry, in your opinion, was the welding of the castings, of superchargers for airplane motors, proper?" The court sustained an objection to this question. We think that in each case this was error and was prejudicial. The express provisions of the statute made it highly material to Frank Schmeller's defense to show the jury whether or not he believed that the welding of these castings done in the foundry was proper. He had a right to say so in

his own way. He also had a right to answer the question from his experience in the foundry, in which he had spent twenty years. His lack of technical schooling went to the weight, and not to the competency of the evidence. The wilful making of defective war material was at issue, and the whole background of the operation was important and possibly determinative. It was also error to strike out the testimony of the Foundry Company's chief engineer that welding is a normal foundry custom.

John L. Schmeller contends that none of the evidence which related to transactions subsequent to April 2, 1942, the date of the making of the defective part, was competent to establish his guilt of the substantive charge. This contention, however, ignores the fact that much of the same evidence, if competent and relevant to the conspiracy charged, might also be admissible as evidence tending to establish the wilfulness which was an element of the substantive charge. Acts similar to those charged in the indictment can be proved to show intent when they are sufficiently near and so related in kind as to fairly throw light on the question of intent and are closely related and of the same general nature as the transactions out of which the alleged criminal act arose. Prettyman v. United States, 6 Cir., 180 F. 30; Edwards v. United States, 6 Cir., 249 F. 686. Evidence of such facts and circumstances both prior and subsequent are admissible if not too remote in time. Holt v. United States, 6 Cir., 42 F.2d 103, 106; Moffatt v. United States, 8 Cir., 232 F. 522. However, the court should have charged in connection with this subject that testimony as to conversations held not in the presence of one or more of the various appellants and not binding on them in their official capacity were inadmissible against them unless the conspiracy was proved.

As stated by Chief Justice Marshall in Douglass & Mandeville v. McAllister, 3 Cranch 298, 2 L.Ed. 445, the court is certainly bound to give an opinion, if required, upon any point relevant to the issue. The statute charged to be violated might easily be subject to misconstruction by the jury unless its provisions were explained by the court. Points relevant to the defense and to the proper application of the statute were clearly developed in the evidence upon which the court did not charge. Certain of these points were vital, and under this record a charge dealing with

them was required to be given, even in absence of request. Wiborg v. United States, supra.

█ The court failed to point out to the jury that failure to comply with a specification, whether drawn by the Government or Packard, while it might constitute a breach of contract, was not in and of itself a violation of the federal statute. Such a charge should have been given.[1] Obviously an act or transaction which violates a contract or specification is not covered by the statute unless it creates defective war material. Violation of specifications approved by the Army Air Corps may be evidence of defective making, but does not establish it. The statute does not make failure to observe such specifications a crime.[2]

· █ The court failed to instruct the jury that welding in and of itself does not necessarily result in a defective part. Such a charge should have been given, for the defense was based largely upon the proposition that since welding is an established foundry practice, actually carried on by Packard itself and subsequently authorized by the Army Air Corps, the mere proof of welding could establish neither the fact of wilfulness, which is an essential element of the crime, nor the fact of defectiveness in the material.

These errors in the charge and in the exclusion of testimony would require remanding of the cases for new trial, if it were not for the fact that we think there is no evidence in the record to support the conviction of any of the appellants under count III.

There is no evidence connecting John L. Schmeller with the making of the particular casting described in count III. This casting bore heat number of the date of April 2, 1942, and it was received at the Packard plant on or about April 8, 1942. In order to convict John L. Schmeller on this particular count, under the statute it had to be shown (1) that he knew on or prior to April 2, 1942, that castings were being welded; (2) that he knew that this casting would or might be welded defectively, causing defective war material; (3) that he had reason to believe that the United States and Great Britain would be injured, and (4) that he wilfully directed or failed to prevent the making of the castings. If he knew of the welding and of the likelihood of defective welding and failed to prevent, or directed the operation, it would be inferred that he intended to impede the war effort.

There is not a scintilla of evidence that John L. Schmeller knew specifically that these castings were being welded before April 2, 1942. In fact it appears that he was told by the Foundry Company employees that these castings were not being welded. He began his connection with the company as a salesman, never worked in the foundry, and as executive vice president was in charge of sales. Much of the effort during this period was devoted to sales promotion, to construction of a large new plant because of an extensive and disastrous fire, and securing war contracts. It is uncontradicted that he left the operation of the foundry entirely to Frank Schmeller, Edward Schmeller, and Helm. When Packard discovered in April that parts were being welded, it telephoned Helm. Drake's letter of April 16th, complaining about the welding, was addressed to Helm at the foundry, and not to John L. Schmeller at the office located in the center of Cleveland, some four miles from the foundry. A number of later letters from Packard were introduced, embodying complaints as to welding and bearing notations by John L. Schmeller referring the matter to Helm or some other executive for report. On several occasions he ordered that some one of these executives write a letter in answer to the Packard communication. There is no substantial proof that before April 2, 1942, the matter came to the attention of John L. Schmeller. In answer to a blanket question as to his knowledge that Packard did not want the castings welded, he said he saw some complaints come over his desk, and in effect said that he knew this in January, February and March, but later he testified that the first complaints were made in April and

---

[1] The specification as to welding was drawn by Packard. Later, upon Packard's application it was relaxed by the Army Air Corps, which now permits welding both by Packard and by the subcontractors, and even permits welding on stressed areas of airplane parts.

[2] H. R. 3442, 78th Cong., 1st Sess., which included in the original draft this general proposition has been reported by the Committee on the Judiciary with this provision stricken out.

May. Drake corroborates this, for his first complaint was made by telephone, and was in April. Both Drake and Baker say they first heard the Foundry Company was welding in April and none of the higher Packard officials places the complaints prior to April.

As to Frank I. Schmeller and Edward Schmeller, a different factual situation is presented. Edward Schmeller, as metallurgist, was in full charge of making the castings and the welding was done under his supervision from January, 1942, on. Even though it was the normal foundry procedure, Frank Schmeller, as plant superintendent, knew of and had control of the operation. It was their decision, together with Helm, several days after Packard's first written protest (April 16, 1942), as stated by Helm, to continue "slight touch-up welding." It was their decision, together with Helm, early in June, 1942, to conceal from Packard the fact that they were welding. This was done not only by their denials that the operation was being carried on, but by more active methods. Frank Schmeller arranged and enforced the shift in hours by which the welding was no longer done in the usual daytime period. Edward Schmeller approved this arrangement. Both Edward Schmeller and Frank Schmeller when the Federal Bureau of Investigation began its investigation, told the welders to say to the investigators that welding was not being done. This concealment is by far the most serious element in the facts against these two appellants, for concealment of the weld might well defeat the efficacy of the tests of the part welded, both at the foundry and at Packard.

However, no letter from Packard on the subject of welding was ever addressed either to Frank Schmeller or Edward Schmeller. It is their story in effect that in the disorganization which followed the fire, the rebuilding of one plant and the adaptation of another plant, the rapid expansion of employees, and the pressure of Packard and the Army authorities for speedy and increased production, they did not consider the routine copies of letters not addressed to them personally, and never saw the specifications during these transactions with Packard. Frank I. Schmeller stated that it was not necessary to have specifications to know how to make a casting; that all that was needed was a pattern and core-boxes. He had the metal specifications, which was a separate list of requirements, and this record presents no complaint that the metal specifications were not carefully followed. LaRock government expert, said that his chemical test showed that the metal specifications had been substantially complied with.

As to these two appellants, the crucial question is whether the stubborn perversity which they displayed is evidence of a wilful, that is to say, intentional making of defective castings. This stubbornness and unethical concealment plainly is evidence of wilfulness, which as used in the criminal statutes "means no more than that the person charged with the duty knows what he is doing. It does not mean that, in addition, he must suppose that he is breaking the law." American Surety Co. v. Sullivan, 2 Cir., 7 F.2d 605, 606. Wilfully means with design, and does not require an evil intent except that the defendant shall have purposely or intentionally failed to obey the statute, having knowledge of the facts. United States v. Edwards, C.C., 43 F. 67; Grand Trunk Ry. Co. v. United States, 7 Cir., 229 F. 116, 119; United States v. Murdock, 290 U.S. 389, 54 S.Ct. 223, 78 L.Ed. 381. But the controlling question is not whether wilfulness was exhibited, but whether there was a wilful violation of the statute on April 2, 1942.

After an exhaustive consideration of this record we think there is no substantial evidence that Frank Schmeller or Edward Schmeller wilfully made or caused this particular casting to be made defectively. There is no evidence whatever of deliberate sabotage at the plant. The instructions given to all of the welders were that they were to do the best possible job both as to quality and quantity of production. The men were apprised of the fact that this was war work and were urged to do their patriotic duty. Orders were never shown to have been given to weld broken parts. It is uncontradicted that the orders were to do only slight "touch-up" welding, the welding of minor defects which was considered in the foundry a clean-up job. It is also uncontradicted that quantity production could not be secured without some welding. This is testified by certain of the defendants, and it is corroborated by Packard's representatives. Rodgers, who was pattern supervisor for Packard, talked to Helm, St. John and Chrysler (of the Foundry Company) about some 80 castings that had been shipped back as rejects from Packard to the Foundry Company. They looked

554

over the castings to see whether they had been rightly rejected. Rodgers stated that in his opinion some of the castings were good castings and could be repaired at the foundry. He therefore arranged to have them "repaired and then sent back to Packard." Coon, production metallurgist for Packard, was one of those who examined eight castings sent to Packard in July for examination to determine whether welding was actually being done by the Foundry Company. Coon said that it was a pity some of the castings sent to Packard had been welded, because "some of the welds are so small that we could have accepted them as they were."

The specifications prohibited repairing by "plugging, welding or other methods without written permission from the purchaser." We think that part of the initial insistence of the Foundry Company officials that welding was not being done is explained by this provision. It is a fair conclusion from the record that the Foundry Company contended at first that welding in violation of the specifications was not being done, because it considered that repairs were not being made by welding, but only touching-up and cleaning of leaks, small pinholes, and the minor imperfections present in almost every casting.

The Packard job was five or ten per cent of the Foundry Company's total production of parts, all of which was war work, and much of which was airplane parts. On its other war contracts the Foundry Company, in the exercise of its normal foundry practice, constantly welded for Ford, Continental and Lycoming, the work being done on airplane engines, and no complaint has been made of defective castings except by Packard. LaRock, the Government's expert examined ten parts exhaustively, but failed to testify as to five of them. Moreover, considering the disastrous fire, the new plant and the disorganization arising from the training of more than one thousand men for foundry work, expanding to a force some six times the original size, and quadrupling production within twenty-four months after the fire, some rejects were to be expected. A three per cent rejection by Packard was not shown to be abnormal.

Rodgers states that a number of parts were shipped on Packard's orders without any tests being made at the foundry. Certain fixtures in the machinery for the water pressure test, which were to be sent by Packard, did not arrive until the end of April, and the equipment for the microscopic tests was not secured until later. Packard tacitly winked at the welding during this period, for its inspectors saw it done in the foundry, and the first complaints were all made after April 2d. It was when Packard began to demand rigid conformity to the specifications that Frank Schmeller and Edward Schmeller stubbornly decided to continue touch-up welding. This was perverse and wilful, and every concealment of welding was perverse, wilful and unethical. If these acts had been done prior to April 2d, they would constitute evidence that in complete disregard of the result these appellants were willing to have welding done defectively; but the concealment took place some two months after the casting in question was made, and no proof is offered that these appellants intended that casting to be defective.

The judgments and sentences as to John L. Schmeller, Frank I. Schmeller and Edward Schmeller are set aside, and the cases are remanded with direction to grant the motion for directed verdict made by the defendants at the conclusion of the evidence.