**RICHARDSON et al. v. UNITED STATES.**
No. 9804.

Circuit Court of Appeals, Sixth Circuit.
May 14, 1945.

As Amended on Denial of Rehearing
July 9, 1945.

L. E. Gwinn, of Memphis, Tenn. (L. E. Gwinn and Wils Davis, both of Memphis, Tenn., and James A. Finch, of Cape Girardeau, Mo., on the brief), for appellants.

Thomas M. Darnall, of Washington, D. C., and William McClanahan, of Memphis, Tenn., for appellee.

Before ALLEN, HAMILTON, and McALLISTER, Circuit Judges.

ALLEN, Circuit Judge.

The appellants, Walter Richardson and Walter Richardson, Jr., hereinafter called Richardson, Sr., and Richardson, Jr., were convicted on two counts of an indictment charging violation of the mail fraud statute, Title 18, U.S.C., § 338, 18 U.S.C.A. § 338. In this court they attack the validity of the indictment, contend that the verdict should have been directed in their favor on all counts of the indictment, and assert that the court erred in refusing certain special requests and that the trial was unfair.

The indictment charged in substance that the appellants, who are father and son, farmers and landowners, residents of New Madrid County, Missouri, with the intent to defraud, falsely represented that cotton pledged by them to the Mid-South Cotton Growers Association was eligible for loans or advancements under the 1942 Cotton Loan Program of the Commodity Credit Corporation (hereinafter called the C.C.C.); that the appellants, as a part of their scheme to defraud cotton loan agencies and producers of cotton and cotton equities, fraudulently organized under the provisions of the Smith-Doxey Act, 7 U.S.C., § 473a, b, c, 7 U.S.C.A. §§ 473a–473c, the LaFont and Richardson One-Variety Cotton Improvement Associations; that by means of their connection with and domination of such associations the appellants were enabled to, and did submit to the board of cotton examiners, false samples on cotton owned or purchased by them, and on such samples obtained classifications of cotton higher than its actual grade, certified on official forms by such board, and fraudulently used these classifications in obtaining loans and in making sales of cotton and cotton equities and that various letters were mailed in pursuance of this scheme. The appellants were each convicted on Counts I and II of the indictment and found not guilty on Counts III, IV and V. Each appellant was fined $1,000 and given a five-year sentence upon each of the two counts, the sentences to run concurrently.

In April, 1937, the Smith-Doxey Act was enacted, providing for the establishment of groups of cotton producers to encourage the improvement in quality of cotton and better marketing conditions for the producer. The Act and regulations promulgated thereunder provide for the organization of groups of farmers who will agree to produce one variety of cotton, and grant to such groups free classification of cotton by established government classing offices. The classification is made according to the official cotton standards of the United States, and when cotton is submitted for classification the government classing office issues a Cotton Classification Memorandum Form 1 card (Smith-Doxey or green card) showing the grade and staple of the cotton classified. Cotton brokers accept this card as indicating the grade and staple of cotton contained in the bale, and the holder is thus permitted to obtain loans or to sell his cotton without furnishing samples to lending agencies or to possible buyers.

The Government contends that the appellants, through their control of the LaFont and Richardson Associations, and through the submission of fraudulent samples to the board of cotton examiners, were able to and did secure upon inferior cotton sold to them by tenants of Richardson, Sr., government (Smith-Doxey) classifications three or four times higher in grade than the cotton actually was. This charge, we think, is plainly expressed in the indictment, and states a fraud which, if consummated by illegal mailing, falls within the purview of the statute. There is no evidence whatever in this record of appellants' want of knowledge of the charge nor of the broad details covering it. Appellants were fairly informed of the crime charged, so as to enable them to prepare for defense, and so as to make the judgment a complete defense to a second prosecution for the same offense, and this complies with the test of a valid indictment. Lamar v. United States, 241 U.S. 103, 36 S.Ct. 535, 60 L. Ed. 912; Bettman v. United States, 6 Cir., 224 F. 819, 826; Hughes v. United States, 6 Cir., 114 F.2d 285, 288.

While a request was made for a bill of particulars, it was not pressed, and the Government in all respects complied with appellants' demand for information. The denial of the motion for bill of particulars is now urged as error, upon the ground that it was impossible to check thousands of bales of cotton unless detailed records were given to appellant's counsel. However, the Government agreed in open court to produce for inspection worksheets and classification sheets of the cotton involved, and the court at the same time indicated to appellants' counsel that if the papers desired were not available to him, or if he was refused permission

to inspect them, on application the court would take care of the matter. Such an order was not asked, and we conclude that no error exists in the denial of the bill of particulars. The motion is directed to the sound discretion of the trial court, and clearly in this instance the denial of the motion did not constitute an abuse of discretion. Landay v. United States, 6 Cir., 108 F.2d 698, 703.

The court did not err in overruling the motion to direct a verdict on the first count of the indictment. It was shown that Richardson, Sr., owned the Marston gin, and together with Richardson, ·Jr., owned the Peach Orchard gin. The cotton raised by the 230 tenants of Richardson, Sr., and bought by him, was ginned at these two plants. Two witnesses, including Paul Buckley, who was in charge of the sample room at the Marston gin, testified in effect that in the winter of 1942–3, at the direction of Richardson, Sr., and in the presence and with the knowledge of Richardson, Jr., at the Marston gin, operated by Richardson, Sr., they substituted samples of good grade cotton for samples which were low grade in color or quality. Buckley stated that an entire bale of cotton of good grade was cut up into about 700 samples which were used for the inferior bales. Various witnesses testified that at about this time they sold to Richardson, Sr., a number of bales of snap or "bolly" cotton, which is cotton of low grade. Richardson, Jr., had already complained to the government classing office at Hayti, Missouri, that the cotton was classed too low. Richardson, Sr., secured from the Mid-South a loan on 503 bales, and later sold the equities in this cotton to two dealers, John A. DuPre and Roy Faust, on January 7, 1943, for Lend-Lease contracts, the purchasers being shown the worksheet containing the list of the grade and staple according to the Smith-Doxey classification. After DuPre paid Richardson, Sr., for the cotton, he grew suspicious and ordered a reclassification by the government office in Memphis which checked samples from the 503 bales and reported many of them to be three or four grades below that represented.

A tabulation based upon evidence as to the classification of 32 bales sold by Richardson, Sr., to Faust on January 15, 1943, showed that most bales had at least two classifications, while many of them had three classifications. The contemplated sale was for Lend-Lease purposes, and it was necessary to secure a grade of cotton not less than middling, a good commercial grade. On the first classification, in December, none of the bales was classed as middling. On the second classification of twelve bales, only one was classed as middling, while on the third classification every one of the bales was classed as middling. On review classification by the government office not one of the 32 bales was middling, 22 bales being strict good ordinary, which is three grades below middling. Faust, who had begun to doubt the quality of the cotton, complained of it on January 14th to Richardson, Sr. He testified that Richardson, Sr., answered, "Well, go ahead and give it to the Government, they are going to give it away anyhow, to Russia or England, it will probably be sunk in the Atlantic." The loss to DuPre and Faust was shown to be some $12,200.

Irrespective of these facts, counsel for appellants contend that no fraudulent use of the mails is shown because no document was mailed in furtherance of the scheme. The mailing of a release on January 9, 1943, from Portageville, Missouri to Memphis, Tennessee, is relied on by the Government as constituting such use of the mails. In order that DuPre and Faust could sell the cotton, it had to be released from the loan at the Mid-South office in Memphis. Such a document was prepared, and signed by Richardson, Senior at the time he received the check from DuPre. The Memphis Mid-South office objected to the form of this release, demanded that it be signed by the individual cotton producers, and notified both DuPre and Richardson that the release was not satisfactory. DuPre immediately stopped payment on the check. Richardson, Sr., then secured another release signed partly by individual producers and partly by himself for certain producers whose names he claimed to have authority to sign. This release was delivered to the office of the Mid-South at Portageville, where Richardson, Sr., did business, and forwarded to the Memphis office by registered mail Saturday, January 9th, being received Monday, January 11th. Appellants contend that this mailing was not in furtherance of a scheme to defraud because Richardson, Sr., did not specifically direct that the release be mailed. We think this contention has no merit. The original release had been held to be in-

sufficient, and Richardson, Sr., understood that he must deliver to the Memphis office a release which would meet the requirements. The bookkeeper of the Portageville office testified repeatedly that she understood that Richardson, Sr., wanted her to get the release to Memphis as soon as possible.

Within the intendment of the adjudicated cases, we think that Richardson, Sr.'s pressure to have the release sent to Memphis as soon as possible fairly contemplated the use of the mails, and was in furtherance of the fraudulent scheme set forth in the indictment. When an accused does an act with knowledge that use of the mails will follow in the usual course of business, or where such use may reasonably be foreseen, although not actually intended, under the statute the accused has caused the mails to be used. United States v. Kenofskey, 243 U.S. 440, 37 S.Ct. 438, 61 L.Ed. 836; Bogy v. United States, 6 Cir., 96 F.2d 734, certiorari denied, 305 U. S. 608, 59 S.Ct. 68, 83 L.Ed. 387; Blue v. United States, 6 Cir., 138 F.2d 351, 362.

Nor can we agree with the appellants' contention that the transaction had already been completed on January 9th, when Richardson, Sr., delivered the final release at the Portageville office, and that the mailing, even if set in motion by Richardson, Sr., was not in furtherance of the scheme to defraud. Payment of the check had been stopped by DuPre. Assuming, but not deciding that the National Bank of Commerce, Memphis, which accepted DuPre's check for deposit by Richardson on January 8th, was legally liable to maintain the credit in Richardson, Sr.'s account even though payment of the check had been stopped, the transaction had not been completed until delivery of the release in satisfactory form was made to the Memphis office.

On a motion for directed verdict in a criminal case the evidence must be considered in the light most favorable to the Government. Applying this rule, the Dis-

trict Court did not err in overruling the motion for directed verdict as to the first count of the indictment. Bogy v. United States, supra.

As to the document alleged under Count II of the indictment to have been mailed, a different question is presented. It was a letter called forth by an error in the drafting of the confirmation of sale between DuPre, Faust and Richardson, Sr. The confirmation of sale, which was a written contract drawn in DuPre's office on January 7, 1943, contained a statement "Smith-Doxey class guaranteed." It is uncontradicted that the parties contemplated the usual sale where the cotton had been classed under the Smith-Doxey Act, in which the seller simply assures the buyer that a Smith-Doxey class card is attached to each bale of cotton sold. DuPre and Faust visited the Mid-South office at Memphis and checked the presence of the Smith-Doxey class card on each bale prior to the consummation of the sale. Richardson, Sr.'s letter[1] to DuPre after the confirmation of sale had been executed, pointed out that he had guaranteed only that each bale carried a Smith-Doxey card, and DuPre stated that this was correct, saying that Richardson "guaranteed every bale to have a Smith-Doxey card on it."

We see no connection whatever between the mailing of the letter and the scheme to defraud charged in the indictment. It had no purpose to prevent discovery or to contribute to any subsequent fraud. Cf. Bogy v. United States, supra. The mail fraud statute, Title 18, U.S.C., § 338, 18 U.S.C.A. § 338, covers only such letters as are mailed or caused to be mailed for the purpose of executing or concealing the scheme or artifice, or attempting to do so. The letter must have some relation to and be a step in the consummation, or attempted consummation, of the fraud. Barnes v. United States, 8 Cir., 25 F.2d 61, 64. The guaranty or warranty by Richardson, Sr., of the accuracy of the Smith-Doxey classifications was not

[1] "Marston, Missouri 1-9-43
"Mr. John A. DuPree
"Dear Sir:
 "I have tried for the last hour to get you but could not as you know the Man turned the check down of course. We got that all straightened out but your confirmation reads Smith Doxey class gurnteed [sic] but it should have read Smith-Doxey class card gurnteed for I am not gurnteeing to him anything on the 506 B/C My cotton & 80 B/C Jinn cotton except that the Smith Doxey card is on each Bale No class of any kind is gurnteed. You of course know is & if it was you I would not write anything & if you pay the check be sure & Tell him for I dont want any hereafter.
 "(Signed) Walter Richardson."

averred in the indictment nor in any way involved in any of the transactions set forth. This particular letter, therefore, was no part of the fraudulent scheme charged, and could have no effect, direct or indirect, in forwarding the scheme. It follows that the District Court should have sustained the motion to direct a verdict for appellants as to Count II of the indictment and that conviction on that count as to both appellants must be set aside. McLendon v. United States, 6 Cir., 2 F.2d 660, 661. The case, however, must be remanded for retrial on the charge embodied in Count I of the indictment; and as the case is to be tried again, we proceed to consider the more important questions presented here with reference to the submission of that issue.

Counsel for appellants contend that reversible error was committed in allowing testimony to be given as to the sale of cotton to the Alexander Sprunt Company by Richardson, Sr., and as to the purchase of cotton from Kohn Brothers Gin Company by Richardson, Jr., and Buckley. Neither of these transactions was charged in the indictment, and it is contended that they are totally irrelevant and prejudicial.

 As to the Sprunt transaction, Buckley testified on direct examination without objection from counsel for the appellants. He stated in effect that Hardaway, a cotton dealer, bought some thousand bales of cotton from Richardson, Sr., for which the drafts were not paid and the cotton came back to Richardson. Buckley said that Hardaway had sold the better quality cotton from this lot and had returned mostly "strict lows," which is a grade below middling. Richardson, Sr., wanted to sell this cotton, and some 800 bales of it were finally sold to the Sprunt Company, which was endeavoring to secure cotton for sale under Lend-Lease. Lend-lease cotton was required to be of a grade of middling or better. Buckley testified that he did not think there was any middling cotton in that sold to the Sprunt Company, and intimated that the samples were switched in this transaction to secure the government classification of middling cotton. He stated that he said to Richardson, Sr., "It looks like it is kind of risky to me." Richardson answered, according to Buckley, that the cotton "was going to England or Russia and it would probably be sunk over there any way." While this testimony was clearly damaging, we think it was admissible. Since it was brought

out on direct examination, no question arises as to the violation of the federal rule of cross-examination. Acts similar to those charged in the indictment can be proved to show intent when they are sufficiently near and so related in kind as fairly to throw light on the question of intent, and are closely related and of the same general nature as the transactions out of which the alleged criminal act arose. Schmeller v. United States, 6 Cir., 143 F.2d 544, 551.

 The transaction as to the Kohn cotton was first brought out by counsel for appellants, who cross-examined Buckley with reference to these transactions. This cotton was purchased by Buckley and Richardson, Jr., under joint account, and placed in loan with Mid-South by Richardson, Jr., as a producer. Appellants contend that the federal rule was violated in the cross-examination of Richardson, Jr., as to the loan on this cotton. But much of this testimony came in without objection, and in view of that fact the admission of the warehouse receipt was not prejudicial. As in the case of the Sprunt cotton, we think that this testimony doubtless was effective against appellants; but defense counsel brought it into the case, and the transaction was admissible as bearing upon intent to defraud by representing that cotton owned by a non-producer and non-member of the Mid-South was put in the loan represented as that of a producer-member. Schmeller v. United States, supra.

 Other testimony, however, was clearly incompetent, and its admission was prejudicial. There were numerous instances of this kind, of which we discuss only a few. Richardson, Sr., rented some 11,000 acres of land to various tenants. Their contract with him was that they would gin their cotton at the Richardson gins, or pay double the stipulated rent. This fact was relevant as bearing upon the alleged domination of the tenants by Richardson, Sr., but the price paid for the land bore neither on the guilt nor innocence of the appellants. A number of tenants testified as to the rent they paid each year, and Richardson, Sr., was cross-examined with reference to the whole amount received. He was also cross-examined as to the amount of cash which he carried on his person. This was objected to, was error, and was highly prejudicial. The effect was to emphasize to the jury the ap-

parent contention of the Government that a very rich man was defrauding not only the parties named in the indictment, but individual tenants. The questions as to the benefit the farmers received from the La-Font and Richardson One-Variety organizations under the Smith-Doxey Act were prejudicial. After asking what benefit the farmers got out of it, the question, "Did the members of either the LaFont One Variety Association or the Richardson One Variety Association get any benefit out of this classing except the Richardsons?" was twice permitted by the court. This question was unfair. It appears without contradiction that these associations were organized by Richardson, Jr., under advice of the County Agricultural Agent, and in the same manner as similar organizations were organized under the Smith-Doxey Act; that the benefits received from the organization, such as free classification of cotton, were known to the tenants to be open to them as members of the association, and were in fact received by them.

 Equally prejudicial were repeated questions asked by the district attorney with the apparently deliberate intent of inflaming the jury against the appellants. It was charged in the indictment that certain lending associations made loans upon appellants' fraudulent classifications of cotton, and the record shows that a civil suit was pending over this question at the time of the trial, between the Mid-South and the appellants. The Government had agreed, according to the testimony of Phillips, post office inspector, that the financial transactions with the Mid-South should not be gone into in the evidence, and it was partly upon this assurance that the application for bill of particulars was not pressed. This agreement was violated. Other instances of misconduct on the part of the district attorney appear in the record. On occasions too numerous to detail he made unjustifiable accusations and then withdrew the question; but the error was not cured.

In our opinion the effect of these statements was prejudicial. This was a close case. The injection over and over, by repetitious questions, of the idea that the Richardsons were very rich men; that the community loan agency had been defrauded of large sums by them, may well have tipped the balance against the appellants. Whether or not these appellants are guilty is not for us to decide, and as above in-

dicated, there is sufficient evidence to support submission to the jury of the first count of the indictment. Appellants, however, were entitled to a fair trial, and they did not receive it.

No exception was taken to the general charge of the court. A number of special requests were made, most of which were not germane to the case, or were adequately covered in the general charge. We consider here the refusal of the court to charge requests Nos. 6 and 7, which read as follows:

Request No. 6.

"The Court further instructs the jury that loans made by the Mid-South Cotton Growers Association to persons who were not members of such Mid-South Cotton Growers Association were not government loans and could never become government loans, and such loans were not subject to regulations by any government agency."

Request No. 7.

"At the request of the defendants, the Court further instructs the jury that the Mid-South Cotton Growers Association is not a government agency, but is a private cooperative organization and that the Mid-South Cotton Growers could make loans to any person on cotton whether raised or owned by the borrower and that unless a loan was made to a member of the Mid-South Cotton Growers Association who was a producer within the meaning of the regulations of the Department of Agriculture, such loan could never pass to the Commodity Credit Corporation under its contract with the Mid-South or in any sense become a government loan or subject to any government regulation."

A similar contention was raised by motion. The motion and the request to charge are founded upon appellants' contention that the question of eligibility of the cotton and ownership of the cotton arises only if the Mid-South loans were government loans, to be controlled by the contract between the Mid-South and the Commodity Credit Corporation, an instrumentality of the United States Government.

The Mid-South is a cooperative marketing association organized under the laws of Tennessee, and under section 3790 of the 1932 Tennessee Code, endowed with the usual powers of marketing associations. Such associations may "buy, sell and deal in the agricultural products of non-members to an extent not greater in

value than such as are handled by it for its members." The Mid-South contracted with the Commodity Credit Corporation to make loans upon eligible cotton as defined in section 2 of the 1942 C.C.C. Cotton Form G Loan Agreement. This section, so far as material, reads as follows:

"2. Eligible cotton shall be cotton of the 1942 crop which meets all the following requirements:

"(a) Such cotton must be tendered to the Corporation by the Association prior to July 31, 1943;

"(b) Such cotton must be covered by a Producer's Warranty and Agreement (1942 C.C.C. Cotton Form G-2), a copy of which is attached hereto as Exhibit 'C,' executed by the producer-member who delivered such cotton to the Association;

"(c) Such cotton must be delivered to the Association by a producer-member who is eligible, under the 1942 Cotton Loan Instructions and 1942 Cotton Producer's Note and Loan Agreement (1942 C.C.C. Cotton Form A), for a loan on such cotton at the full loan rate.

"(d) Such cotton must be delivered to the Association prior to May 1, 1943, by a producer member (1) to whom the Agricultural Adjustment Agency has issued white marketing cards on Form Cotton 611 which are not marked 'Penalty Secured' or 'One Thousand Pounds' for all farms in the county on which cotton was produced by or for him in 1942 (including all farms listed in the Producer's Warranty and Agreement executed by such producer), or (2) who has obtained and delivered to the Association a certificate executed by the County Agricultural Conservation Committee for the county in which the cotton was produced stating that such producer is entitled to a loan at the full loan rate on such cotton."

■ Appellants were charged in the indictment with falsely and fraudulently representing cotton placed in loan to be eligible to the benefits of the 1942 Cotton Loan Program of the Commodity Credit Corporation; that is, that the cotton belonged to the producer-borrower; that he had produced it in 1942; that it had not been sold by him since he produced it; that the beneficial title to the cotton was and always had been in the producer-borrower. Much was therefore made of the fact that the cotton involved had been sold outright to appellants and was therefore at the time of the various loans not owned by the alleged producers who signed the loan agreements; that Richardson, Sr., was not a producer, and that as to the Kohn cotton, Richardson, Jr., was not a producer. The court correctly held that one who receives cash rent for land is not a producer of cotton grown on the land, and hence is not eligible for a 1942 cotton loan.

The C.C.C., under its contract, stood ready to lend money to Mid-South on the cotton received as collateral in the Mid-South loans. Prior to the making of any such loan by the C.C.C., the Mid-South, under the contract, had to execute a warranty that the conditions described in paragraph 2, above quoted, existed, including the condition that the cotton was delivered by a producer-member, and in other respects make a separate formal contract. But Mid-South was authorized under the Tennessee statute to lend to persons who were neither members nor producers. Part of the confusion here perhaps arose from the loose practice in the main office of Mid-South at Memphis, in not forwarding copies of its contract with the C.C.C. to its branch offices. The Portageville office, so far from lending only to members of Mid-South, that is lending on cotton eligible for government loans, loaned to many persons not members of the association. It did not usually inquire whether applicants for loans were members. Of the numerous loans herein involved, only one was made on the cotton of a producer who was a member of the association, and he stated that he did not know that at the time of executing the agreement.

■ The transactions involved here, as contended by appellants, did not constitute government loans. During the period involved in this controversy Mid-South neither applied for a loan from the C.C.C., nor pledged, nor offered to pledge, any of the cotton involved in these loans, and no payment of any sum whatever was made by the C.C.C. The contract between the C.C.C. and Mid-South contemplated future government loans to Mid-South; it did not make such present loans. The fact that Mid-South secured funds from the Central Bank for Cooperatives, a government agency, is immaterial, for the appellants are not charged with misrepresenting the eligibility of the cotton except under the C.C.C. contract.

Also, while under the contract between Mid-South and the C.C.C. borrowers had to be members of Mid-South, Mid-South had to warrant the existence of this fact to the C.C.C. before any loan was consummated. Hence Mid-South, including the Portageville branch, which was bound to know its own membership, could not apply for a government loan for non-members without its being party to a fraud upon the Government.

However, the Producer's Warranty and Agreement, the form used in these Mid-South loans, incorporates by reference the C.C.C. contract. Any one who knowingly signed this agreement certainly warranted that the beneficial interest in the cotton was in the signer; that he was both a producer and a member, and that he had had a white marketing card issued to him by the Agricultural Adjustment Agency, or a certificate from the County Agricultural Conservation Committee as required by section 2 of the contract. If he signed for another, he represented that such other was a producer and member, and possessor of a white marketing card or a certificate. Richardson, Jr., executed many of these loan agreements, signing the names of individual producers who he claimed had authorized him to do so, and therefore represented for himself and for Richardson, Sr., with whose knowledge and consent he acted, that these conditions existed. The C.C.C. and the Government were not concerned with these transactions because they were not party to the loans; but Mid-South had a right to rely upon the warranties, and if it was deceived by the representations, fraud in these respects would be established.

It is shown without contradiction that the forms of the loan contracts were filled out by the Mid-South. Richardson, Jr., signed his name as witness to the signatures of many persons not present; but the employees of Mid-South did the same thing. Richardson, Jr., testified without evasion to his signing the names of loan applicants, repeatedly called by the district attorney "forging." Various of the applicants who were producers testified that Richardson, Jr., had the authority to sign their names. Mid-South could not have

been deceived by such signatures, for the signing was openly done in the presence of Mid-South employees who had filled in the blanks and prepared the various papers.

It was also shown that Richardson, Sr., was advised by Ellis, manager of the Portageville office, to prepare the loan applications for his tenants in that way, and that this was not an unusual practice in securing loans for a number of producers where it was difficult to get their personal signatures.

It follows from these facts, which stand uncontradicted, that it was error for the court to permit witnesses to testify that in effect this transaction was a government loan. Moreover, this action was prejudicial. The approval of the court given to the doctrine that these private loans were loans made by the Government, and that the alleged defrauding of a private association was in effect a defrauding of the Government in wartime, could not help arousing prejudice in the jury. While requested charges Nos. 6 and 7 are too broad, the court's attention had been squarely directed to this subject, and it should have charged in substance that the loans were not government loans, and not subject to government regulation. Since Mid-South also was fully aware of the facts surrounding the signing by Richardson, Jr., of the names of other persons to the loan documents and as a witness on such documents, the court should have charged the jury substantially as requested in No. 10, which reads as follows:

"At the request of the defendants, the Court further instructs the jury that the signing by defendants of the names of other persons to loan documents, or the witnessing of such documents, cannot be considered as a circumstance of guilt if it was known to the employees of the Mid-South handling such loan documents and closing such loans, that the same had not been signed by the producer."

The judgment is reversed and the conviction of both appellants on Count II of the indictment is set aside. The case is remanded for new trial as to both appellants on Count I of the indictment, in accordance with this opinion.