UNITED STATES of America

v.

Walter E. ASHE, Appellant.

UNITED STATES of America

v.

Walter E. ASHE, Appellant.

Nos. 71–1033, 71–1509.

United States Court of Appeals, District of Columbia Circuit.

Argued April 12, 1972.

Decided March 26, 1973.

Michael Nussbaum, Washington, D. C. (appointed by this Court) for appellant. James P. Davenport, Washington, D. C., also entered an appearance for appellant, in No. 71–1033.

Herbert M. Silverberg, Washington, D. C. (appointed by this court) for appellant in No. 71–1509.

Guy H. Cunningham, III, Asst. U. S. Atty., with whom Harold H. Titus, Jr., U. S. Atty. and John A. Terry, Asst. U. S. Atty., were on the brief, for appellee. John D. Aldock, Asst. U. S. Atty., at the time the record was filed, also entered an appearance for appellee.

Before LEVENTHAL, ROBINSON and ROBB, Circuit Judges.

LEVENTHAL, Circuit Judge:

This is the third time that we have been asked to review some phase of the Government's case against Walter Ashe. In this latest chapter of the proceedings, Ashe was found not guilty by reason of insanity of a violation of 22 D.C. Code § 2801, carnal knowledge of a female child under sixteen years of age. In 71–1033, Ashe appeals the finding of guilt of the commission of the act, which is implicit in an acquittal by reason of insanity. In 71–1509, he appeals from the determination, following a *Bolton*[1] hearing for his continued custody on the basis of dangerousness because of mental illness.

1. Bolton v. Harris, 130 U.S.App.D.C. 1, 395 F.2d 642 (1968).

## I.

The indictment charges that on October 14, 1967, Walter Ashe had sexual relations with his daughter Mary, then age ten. The Government's evidence consisted of the testimony of Mary Ashe; the corroborative evidence of Mary's then eight or nine year old brother Walter, Jr. and of their mother Mrs. Ashe, both of whom were witnesses to the incident; the testimony of Thomas Ashe, a still-younger brother, who was not a witness to the event itself; and the expert testimony of a pediatrician who examined Mary after the incident. On May 9, 1968, Ashe was brought to trial. Mrs. Ashe invoked her marital privilege. Mary and Walter, Jr. were questioned in order to judge their competency to give evidence. Walter, Jr.'s responses were unclear, and he eventually became unresponsive. At length, defense moved for a mistrial in order that a more thorough examination of Ashe's capacity to stand trial be undertaken. This motion was granted by District Judge Smith.

Ashe was determined fit to stand trial and on October 2, 1968, a second trial was begun before District Judge Green. At this trial, the Government rested its case substantially upon the evidence of Mary and Walter, Jr. Mary's testimony was elicited only with the greatest of difficulty. The first time she took the stand, she did not give damaging testimony. She was excused and later recalled and eventually, after she refreshed her recollection by reading over the statement she had made to the police, her testimony did establish a *corpus delicti.* The Government sought corroboration from Walter, Jr.; the child's response to the questions he was asked were badly garbled and generally difficult to understand. Walter, Jr. did not seem able to place himself at a particular place at a particular time, and his testimony taken as a whole did not specifically corroborate the incident charged in the indictment.

The District Court, *sua sponte* and over the objection of Ashe, raised the question of insanity, and Dr. Mauris Platkin, a St. Elizabeths psychiatrist, testified that Ashe had a personality structure which was not inconsistent with committing deviant sexual acts. (Tr. p. 544: ". . . it is not at all improbable that he could have committed this kind of act. It certainly relates to this condition.") The jury found Ashe guilty, rejecting the insanity issue. Appeal was taken to this court, and on May 12, 1970, we vacated the conviction and remanded. United States v. Ashe, 138 U.S.App.D.C. 356, 427 F.2d 626 (1970). We noted that the Government's case on corroboration was very thin, and that the real corroboration had come from Dr. Platkin. This we held to be unduly prejudicial. "[T]he judge interposing an insanity defense did have the obligation to establish bifurcated trial or some other protective procedure to avoid prejudice to the defendant from the court's insistence of airing a defense interposed contrary to the defendant's will."

On August 20, 1970, the Government began civil commitment proceedings against Ashe under 21 D.C.Code § 541 et seq., but the Commission on Mental Health found that Ashe was not dangerous because of mental illness.

A third trial was consequently begun on November 30, 1970. The proceedings were bifurcated, and the Government's case developed much more smoothly than it had in the trial of October, 1968. Mary Ashe's testimony was direct and to the point, Walter, Jr. coherently corroborated her story, and Thomas Ashe also gave evidence which was generally corroborative as well. After hearing the evidence, the jury brought in a verdict of guilty, whereupon the second stage of the trial—dealing with the insanity issue—was begun. Only one witness was presented, Dr. Robert Robertson of St. Elizabeths. After Dr. Robertson was heard, the jury retired and quickly brought back a verdict of not guilty by reason of insanity. Ashe was committed

to St. Elizabeths for observation, and on February 16, 1971, a *Bolton* hearing was begun before Judge Green, testing the question of whether continued retention in custody should be ordered due to Ashe's dangerousness because of mental illness. The *Bolton* jury found, after hearing almost a dozen witnesses, that Ashe was dangerous due to his mental illness. Judge Green thereupon remanded him to the custody of St. Elizabeths until such time as he was no longer dangerous.

Ashe petitioned for habeas corpus, claiming that his detention for observation at St. Elizabeths was longer than that authorized by Judge Green and that he had not been accorded treatment nor the "least-restrictive alternative" in his disposition. This petition was summarily dismissed by the District Court. We vacated the dismissal in Ashe v. Robinson, 146 U.S.App.D.C. 220, 450 F.2d 681 (1971), and remanded for further proceedings. Nothing has been done about this remand to date, and counsel informed us at oral argument that no further action in that matter is contemplated.

## II.

The Notice of Appeal in 71–1033 was somewhat ambiguous as to what decision was being appealed from. The Government argues that this appeal is evidently from the interlocutory finding of "guilty" by the jury, but that a "guilty" verdict in a bifurcated proceeding, if followed by a verdict of not guilty by reason of insanity, is not a "final decision" within the meaning of the rule that permits appeals only from such decisions. The Government further argues that Ashe failed to file his notice of appeal within the ten-day period of Rule 4(b), Federal Rules of Appellate Procedure. The appeal was noted 13 days after the insanity verdict of the jury and several months prior to the *Bolton* hearing.

We disagree with the Government's contention. We conclude that we have jurisdiction to hear the appeal, and to consider both the sufficiency of the Government's case underlying the implicit finding of guilt and the validity of the detention order. We need not determine whether a bare verdict of not guilty by reason of insanity is "freighted with sufficiently substantial indicia of finality to support an appeal" see Corey v. United States, 375 U.S. 169, 84 S.Ct. 298, 11 L.Ed.2d 229 (1963); United States v. Fort, 133 U.S.App.D.C. 155, 409 F.2d 441 (1969). Certainly the court ordered Ashe's commitment for examination based solely on the jury verdict, and this culminated in an order for continuation of commitment following a *Bolton* hearing. Since we have consolidated the appeal from the verdict of not guilty by reason of insanity, and the appeal 71–1509, from the order of continued commitment, we do not have to decide the technical question as to whether our consideration of the question presented derives from one appeal, or the other, or both.

## III.

Appellant contends that Walter Ashe, Jr. was not a competent witness. For support, appellant cites Walter, Jr.'s performance at the *voir dire* before Judge Smith in the mistrial and his testimony, upon which we commented in *Ashe–I*, at the trial before Judge Green in 1968. In both of these instances, Walter—in startling contrast to his performance at the third trial—was almost an unreachable witness. Although it is difficult to isolate any determinative single reason therefor, it is reasonably plain that poor language skills, together with the intimidation of the courtroom and the obvious painfulness of the subject—which precipitated the dissolution of the Ashe family and the childrens' dispersion into Junior Village and various foster homes —worked a severe inhibition on the child.

■■ Counsel submits that our first opinion, *Ashe-I,* in effect held that Walter, Jr. was not competent to testify, or that at least his testimony was non-corroborative. If it was non-corroborative, then of course the Government's proof in *Ashe-I* failed for want of the corroboration we require in proof of sex offenses. And if, in turn, the Government's proof failed in *Ashe-I,* then the rule in our circuit is clear that another trial cannot be brought.

■■ The Government's response to this chain of reasoning is that even if there had been no corroboration, there was still ample evidence to convict Ashe of simple assault. We do not need to pass upon this response. We believe that Walter, Jr.'s testimony in *Ashe-I* was sufficient to meet the corroboration requirement. That rule must be applied in light of its purpose, to prevent fabrication of easily-fabricated crimes, and not to interpose a technical barrier that rejects a substantial showing of guilt. We attribute most of the deficiencies of Walter, Jr.'s testimony in *Ashe-I* to inferior language skills and emotional turmoil which have since substantially abated. The transcript from *Ashe-II* certainly suggests a child functioning well within the limits of intellectual normality. We are sensitive to the point that Walter, Jr.'s testimony in *Ashe-I* was weak and garbled, but we attribute the weakness to interference factors rather than to any fundamental inability to observe with accuracy. A family where a father is having indecent or incestuous traffic with his children is surely a family in turmoil. In addition to the ordinary and normal testimonial inadequacies which are a part of immaturity, the children of such families are likely to exhibit all sorts of emotional abnormalities which may often prevent their effective communication, especially in a context as intimidating as a crowded, unfamiliar courtroom. Unless we want in effect to wipe the enforcement of the carnal knowledge statute out of the incest situation, we must be prepared to accept evidence from some seriously mixed-up young witnesses, and to be flexible in assessing their competency and evidentiary sufficiency.

■■ Our opinion in *Ashe-I* recognized that the Government's case was thin, but we did not hold it legally insufficient. The thin Government evidence meant that the error of permitting Dr. Platkin's testimony in evidence, without protecting precautions such as bifurcation having first being taken, could not be harmless. We are satisfied that the retrial cured this prejudice. The record in *Ashe-I* indicates that the competency determination was made in open court outside the presence of the jury. The transcript shows that the defendant was present, as is his right under the Sixth Amendment. The procedure was sound. The jury's finding of guilt, which is a part of its total determination of not guilty by reason of insanity, is not infected by legal insufficiency or error, and will not be disturbed.

## IV.

We now address the issues raised in 71–1509, which attacks certain aspects of the *Bolton* hearing. At the end of that hearing, the jury found that Ashe was dangerous because of mental illness and Judge Green thereupon ordered his commitment.

■ A. Appellant claims that the jury *voir dire* was not adequate for purposes of discovering whether there were some prospective jurors who, knowing that Ashe had recently been found to have committed a felonious sex crime and had been declared insane, might be prejudiced on the question of whether Ashe was now "dangerous as a result of mental illness." Counsel submitted twelve questions, which are set out in

footnote 2.[2] The questions Judge Green asked were these (Tr. pp. 27, 28):

1. Are there any of you who feel any sort of prejudice toward people who have been confined in jail, mental hospitals, Saint Elizabeths, or would this be such that it would prevent your reaching a fair decision in this case?

2. Do any of you feel that the conviction of a crime, committing an act of sex with one's own daughter, would necessarily make one committable to a mental hospital?

3. Do any of the members of the panel have any employment or patients or anyone in their family who has ever been employed at Saint Elizabeths Hospital or been a patient there?

4. Does any member of the panel have anyone in their family or have ever themselves suffered from any mental disease or defect?

5. Are there any reasons at all why any member of the panel would prefer not to sit on a case of this kind?

Seven of the prospective jurors told the court of some misgiving they had, based on the questions asked, and six of these were, upon further questioning by the court, excused. While the questions probing the ability of the jurors to render a fair verdict might have been improved, we are satisfied that they did an adequate job of discovering possible prejudice. Certainly appellant cannot claim reversible error for the denial of the argumentative—and equally unfocused—questions requested by appellant.

B. Appellant also argues that the experts were improperly asked whether, in

2. Appellant's proposed voir dire questions were:

1. The law controlling this case requires that a person be both mentally ill and likely to, injure himself or others before he's involuntarily confined in a mental institution.

2. Are there any of you who do not agree that there are many so called mentally ill or disturbed persons who are walking the streets, enjoying their liberty, and not harming anyone (including themselves)?

3. Are there any of you who, after searching your feelings, feel any sort of prejudice towards people who have been confined in jail, mental hospitals—St. Elizabeths—which might render you unable to reach a fair decision in this case.

4. Are there any of you who do not agree that the burden is on the government to establish that the defendant is mentally ill *and* likely to injure himself and others, and the fact that he is in the courtroom today does not raise a presumption of either?

5. Are there any of you who feel that the conviction of a crime of incest, or committing an act of sex with one's daughter, necessarily should make one committable to a mental hospital?

6. Do you jurors agree that the burden is on the government to establish in this case that as the result of a mental illness the defendant is likely to repeat the act of which he stands convicted, or commit some other dangerous act, in order to commit him to SEH?

7. Do you jurors agree that while psychiatrists may testify as to their opinion in this case, it is not binding on you and you may choose to disregard it, or weight it lightly, if your own experience and intuition and judgment lead you to another conclusion?

8. Do you jurors agree that patients at St. Elizabeths Hospital are not presumptively dangerous?

9. Do you jurors agree that mental patients—or people suffering from some mental disturbance—are not necessarily dangerous to society, or themselves, and should not necessarily be confined in mental institutions?

10. Do any of you have any mental illness in your family or among your close friends, which might prevent you from rendering a fair decision in this case?

11. Do any of you have policemen or law enforcement officers in your family?

12. Are there any reasons—perhaps reasons which you may find hard to articulate—which would make any of you uncomfortable in sitting on this kind of case and rendering a fair decision?

their opinion, Ashe was or would be dangerous. Ashe relies on our decision in Washington v. United States, 129 U.S.App.D.C. 29, 390 F.2d 444 (1967). As counsel succinctly put it at argument, "Expert witnesses should never be allowed to speak the magic words."

 There are different vectors of considerations that culminate in a psychiatrist's resultant conclusion as to "dangerousness," yea or nay. Some aspects are primarily determined by his expertise, and others by his value preferences in matters involving community values where the ultimate decisions must be made by the court and jury.[3] The same may also be said of "mental illness" as a legal concept, for this is not controlled by the medical conception. Yet it has not been suggested that a psychiatrist may not speak, in parlance that is natural and understandable, of mental illness. The possibility of confusion must be obviated by attentive explanation, sorting out of factors, and cross-examination.

 The issue of "dangerousness" is different from the issue of "productivity." *Washington* held that experts called to testify on the issue of insanity must not speak in terms of productivity. Our concern was against oversteering of the jury on the ultimate decision of criminal responsibility, one that "intertwine[s] moral, legal and medical judgments," King v. United States, 125 U.S.App.D.C. 318, 324, 372 F.2d 383, 389 (1967). The problem of "oversteering," identified in *Washington*, is not avoided completely but it is substantially diluted here, in a *Bolton* hearing on the issue of dangerousness. As we pointed out in *Brawner*[4] a critical reason for the *Washington* opinion was the lack of a generally accepted meaning for the "product" term. But we specifically held that the expert could testify on the causal relationship between mental disease and the existence of substantial capacity for control at the time of the act. And so in the case at bar, where there is no use of a term like "product" that has no accepted meaning, the expert can testify on the ultimate causal issue. The jury can be expected, with reasonable confidence, to assess the concept of "dangerousness" for itself and in such a way as to reflect community values.

In a *Bolton* hearing, the jury is aware that the witness is not making a scientific finding as to a past fact, but is making an estimate as to the future— the kind of judgment that doubtless reflects some margin of doubt yet is part of his clinical function. Of course the judge clearly charges it is the jury's role to make the determination. Such steering by experts as exists is due not to words and misunderstandings as to the natural tendency to be respectful of the comments of those who have given special study to a subject. It would likely persist to substantially equivalent degree if the expert were merely asked to give his conclusions as to the consequences he foresaw if the individual were released to the community. The substantive criterion for committability is fixed by the statute. It uses terms and concepts that are common parlance for both experts and laymen. The jury needs whatever help the experts can provide, and that should not be cramped by interdicting the use of these terms in the testimony.

 On the other hand, the jury hearing a psychiatrist's testimony of dangerousness, should be informed of its various components: to what extent it reflects a predicting of behavior (often palpably dangerous); whether it is prediction of an occurrence of a kind of behavior that, however deviant, might be considered by the jury to lie in the

3. J. Goldstein and J. Katz, Dangerousness and Mental Illness; Some Observations on the Decision to Release Persons Acquitted By Reason of Insanity, 70 Yale L.J. (1960) 225.

4. United States v. Brawner, 153 U.S.App. D.C. 1, 471 F.2d 969 (1972, en banc).

realm of the private, the eccentric, or the offensive, but not the dangerous. The expert must be prepared to state the bases for his conclusion and be aware that the attorney, seeking to expose the predicate of the expert's conclusion is not necessarily challenging his expertise within its proper realm, but may properly be seeking to ask the jury to come to a different ultimate conclusion on the basis of the community-value factor involved. Following the lead of our *Brawner* opinion [5] we hold that henceforth the *Washington* Appendix should be used in Bolton hearings, following adjustment for the difference in issues, should be sent to the experts in advance of hearing, and should be read at least once to the jury.

C. Appellant strongly contends that Dr. Reisen should have been qualified as an expert in psychiatry and allowed to testify as such. Dr. Reisen is a physician with several years of background—both practical and academic—in psychiatry. He is not a board-certified psychiatrist or neurologist, but of all the physicians who testified, Dr. Reisen knows Ashe best. At oral argument, we were advised that Dr. Reisen is in charge of the observation ward at St. Elizabeths, and is entrusted by the Hospital with considerable unsupervised responsibility. Based on what we glean from the record and what we heard at oral argument, we conclude Dr. Reisen could have qualified as an expert in psychiatry.

We do not however find reversible error, for these reasons: First, counsel at trial did not detail the extent of the responsibility which St. Elizabeths has entrusted to Dr. Reisen. More important, Dr. Reisen was permitted to testify as a physician and to express his opinion on Ashe's probable future dangerousness. He was not allowed to testify directly on Ashe's mental status. But other questions, intimately related to mental status, were allowed. Specifically, he was allowed to testify about how, in his opinion, Ashe would function in the community if released from the hospital. The thrust of that question operates, in effect, in the same way as a question put in terms of mental illness and dangerousness. The witness's projection of the individual's functioning, in the absence of commitment, necessarily embraces an appraisal of the individual's mental and emotional capacities and behavioral controls.

Finally, Ashe's counsel was able to present the testimony of Dr. Paul Weisberg, who did qualify as a psychiatric expert, that appellant was not suffering from mental illness. Dr. Weisberg's testimony on direct was clear and unequivocal, and the skillful cross-examination by the Assistant U.S. Attorney did little to dislodge or becloud any of that testimony. Dr. Reisen's greater familiarity and contacts with Ashe might have given his opinion more weight with the jury. But in a context where the judge was not advised of critical aspects of Dr. Reisen's responsibility at St. Elizabeths, and permitted Dr. Reisen to give testimony concerning the functioning of Ashe if released, we do not think the interest of justice would be served by a finding of reversible error because he did not expressly corroborate Dr. Weisberg's testimony on the absence of present mental illness.

D. Appellant's last major argument challenges the "preponderance of evidence" standard which the *Bolton* jury was charged it must use in its findings of mental illness and dangerousness. Our opinion in United States v. Brown [6] is the contrary.

We have considered appellant's other arguments and find them without merit.

Affirmed.

---

5. See opinion at p. 38, 471 F.2d at p. 1006: "It is the responsibility of all concerned—expert, counsel and judge—to see to it that the jury in an insanity case is informed of the expert's underlying reasons and approach, and is not confronted with ultimate opinions on a take-it-or-leave-it basis. The Appendix to *Washington* is useful in this regard—assuming appropriate modification. . . ."

6. 155 U.S.App.D.C. ——, 478 F.2d 606 (1973).